The judgment appealed from cannot be sustained upon the facts found by the referee, unless the relation of attorney and client, existing between the plaintiff's ancestor and the defendant at the time of the assignment of the contract in question by the former to the latter, distinguishes this case from the ordinary one of the transfer of property by a debtor, with the intent and for the purpose of defrauding creditors. *Page 288 
The referee has found that James Conway, under whom, as his heir-at-law, the plaintiff claims title to the land in dispute, assigned the contract for the purchase of the land to the defendant, for the express purpose of placing it, and his interest in the land under the contract, beyond the reach of his creditors. At least such is the necessary inference from the facts found.
The general rule, that courts will, under such circumstances, extend no remedy to a grantor or vendor of property to recover back from the grantee or vendee the property thus transferred, although the transfer is without consideration, is too well settled to be now called in question.
But the referee has further found that, at the time of the transaction, the defendant was a practicing attorney and counselor of the Supreme Court, and was acting as the attorney and counsel of Conway, and that it was in accordance with and pursuant to his advice, as such counsel, that the contract was assigned to him by Conway; and the referee states, as a conclusion of law, "that, as against an attorney and counselor, the law will set aside an agreement made with his client, by which property is placed in his hands to keep it out of the reach of the creditors of the client." Courts scrutinize closely transactions between attorney and client; and conveyances and transfers of property to the former by the latter, while that relation exists, are frequently set aside in cases where, but for that relation, they would be upheld. In such cases the law presumes that undue advantage has been taken of the confidential relation existing between attorney and client; and attorneys, in order to sustain such transfers to them, have been required to show affirmatively, either that they paid an adequate consideration, or that a gratuity was intended by the client, and that to obtain it no advantage was taken of the confidential relation existing between them, and that everything was honest and fair on their part. *Page 289 
In this case, no gratuity to the attorney was intended. In fact, the client intended to make no transfer of property; for, although all the forms necessary to constitute an assignment of the contract were complied with, yet the assignor intended that the whole transaction should be merely formal, and at the time supposed that such was the fact. He did not intend to part with any beneficial interest in the property. On the contrary, the assignment was made as a means of preventing his interest in the contract and in the land therein described from being applied upon the debt he owed, and of thereby enabling him to continue in the beneficial use and enjoyment of the property. His object in the transaction was to benefit himself and not to confer a benefit on his attorney. For aught that appears, he would, with equal willingness, have made the assignment to some other person, had he been so advised.
The rule of equity, which throws upon the attorney the burden of showing perfect fairness on his part in all his dealings with, and which renders it almost impossible for him to become the recipient of a gratuity or bounty from, his client, is based upon the consideration that the relations existing between the parties is such that the attorney has it in his power to avail himself of the necessities, liberality or credulity of, and of his influence over, the client, and of that sense of dependence, on the part of the latter, upon his attorney, which always exists to a greater or less extent, and of the confidence which the client reposes in his attorney; and also upon the fact that it is difficult, and in most cases impossible, for the client to show that advantage has been taken of the relation.
The reason of the rule does not, perhaps, to the full extent, apply to this case; but yet Conway had applied to the defendant, as an attorney and counselor-at-law, for advice, and it was in accordance with and pursuant to, and, as it is to be presumed, in consequence of, the advice there given that the assignment was made. The assignment was *Page 290 
the direct result of the trust and confidence which Conway reposed in his attorney. I think this case does come within the reason of the rule applicable to ordinary cases of the transfer of property by a client to his attorney, although Conway's object in making the assignment was to benefit himself and not his attorney. The facts disclosed present a case where the court would be called upon to interfere between the defendant and the representative of his client, and compel the former to restore what he had obtained without consideration, were it not for the fact that in making the assignment the parties were both perpetrating a fraud, were both committing a crime; and the question is, which rule is to govern the case, the one applicable to dealings between attorney and client, or the rule that the court will not lend its aid to either of the parties to an illegal or fraudulent contract, either by enforcing its execution, if it be executory, or by rescinding it, if it be executed.
The plaintiff's counsel insists that the former rule should be applied, because it is founded in considerations of public policy. But public policy also dictated the adoption of the other rule.
The latter rule, however, is not of universal application. The taking of more than seven per cent per annum for the use of money is prohibited by statute, and all contracts reserving a greater rate of interest are declared to be void; yet it has been held that usurious interest, paid by a borrower, may be recovered back independently of the statute allowing such recovery; that the maxim inter partes in pari delicto, potior est conditiodefendentis does not apply to such a case, for the reason that the law considers the borrower the victim of the usurer. (Wheaton v. Hibbard, 20 John., 290.) Upon the same principle it has been held in England that money paid to a creditor as a consideration for his signing the certificate of a bankrupt, can be recovered back, although by statute all agreements by a bankrupt with his creditors *Page 291 
to pay money for signing his certificate are declared void. (Smith v. Bromley, 2 Doug., 696.)
In Browning v. Morris (2 Cowp., 790), Lord MANSFIELD laid down and enforced the rule that "where contracts or transactions are prohibited by positive statute for the sake of protecting one set of men from another set of men (the one from their situation and condition being liable to be oppressed or imposed upon by the other), there the parties are not in pari delicto; and, in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract."
Mr. Justice STORY, in his Treatise on Equity Jurisprudence
(vol. 1, § 300), says: "And indeed, in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto, for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, imposition, hardship, undue influence or great inequality of age or condition, so that his guilt may be far less in degree than that of his associate in the offence; and besides, there may be, on the part of the court itself, a necessity of supporting the public interest or public policy, in many cases, however reprehensible the acts of the parties may be." In Osborne v.Williams (18 Ves., 379), cited by Justice STORY under the section above quoted, a bill was filed by the representatives of a deceased son against the representatives of his deceased father to compel the latter to account for the profits received by him from the use of a vessel employed by the post-office department in the public service as a mail packet, after a sale of the vessel by the father to the son. The father had been the commander of the vessel, and, on the transfer being made, the officers of the post-office appointed the son as commander in the place of the father. It appeared that, just prior to the transfer and the appointment of the son as commander, an agreement had been entered into between the father and son, without the knowledge of the officers *Page 292 
of the department, by which agreement, in consideration of the father's resigning the command, allowing the son £ 200 per annum, and defraying the expenses of the vessel, the son relinquished to the father all the earnings of the vessel in as full a manner as if the transfer had not been made and the father had remained in command; and it was shown that the profits, of which an account was sought, were received by the father under this agreement. It was held that this agreement was illegal, as being a fraud on the post-office, and also as being contrary to the ship registry acts; and the master of the rolls, in his opinion in the case, says: "The father, therefore, could never have enforced it" (the agreement); "but my doubt was, whether the father, having received the profits, this court would decree them to be accounted for and refunded, or whether the general rule that inpari delicto potior est conditio possidentis should prevail, as both are guilty of a violation of the law. Upon an examination of the case, however, I think the plaintiffs are entitled to the relief sought by the bill. Courts, both of law and equity, have held that two parties may concur in an illegal act without being deemed in all respects in pari delicto. I consider this agreement as substantially the mere act of the father. He put up to sale a situation which the young man would naturally be desirous of obtaining, and could obtain only on the terms prescribed by the father;" and the representatives of the father were decreed to account to the representatives of the son for all the profits of the vessel received under the fraudulent and illegal contract.
Transactions, contracts and dealings between parent and child are classed with those between attorney and client, and courts scrutinize such dealings and interpose to set aside such contracts for the same reasons in the one case as in the other (1Story's Eq. Jur., §§ 307 to 310); and if a father will be compelled to restore to his son property or money which the former has received from the latter under and *Page 293 
pursuant to a contract between them which was illegal and founded in fraud, and in a case where the court would not interfere were it not for the confidential relation between the parties, as was done in Osborne v. Williams, I see no reason why the same thing should not be done in a like case, where the relation between the parties is that of attorney and client. There is as great a degree of confidence reposed and an equal sense of dependence in the one case as in the other.
In this case, the report of the referee shows that the counsel and advice of the defendant was sought by Conway solely on the question whether his interest in the contract could be reached by his creditor. The advice by the defendant to assign the contract appears to have been volunteered on his part. He first suggested it, and if he had not so done, it is to be presumed the assignment would not have been made.
I think this is a case where, on account of the relations existing between the parties and the circumstances under which the contract was assigned, the court was called upon to interfere and compel the attorney to restore what he had acquired under the assignment, on being repaid what he had disbursed, although the object of the assignment was to perpetrate a fraud. The parties, although in delicto, did not stand in pari delicto. In the transaction, Conway was a mere instrument in the hands of the defendant. If an attorney will so far forget or willfully disregard his duty to the courts, whose license to practice he holds; to his clients, who, in consequence of such license, are induced to seek and act upon his counsel, and to the public, as, for the purpose of gain and profit to himself, to induce by his advice the commission of fraud by those who thus confide in him, he at least should be compelled to restore to his victim the fruits of his iniquity. It would be a reproach to our judicial tribunals should they allow their officers, those appointed by them as their assistants in the administering of justice *Page 294 
and equity, thus to acquire property by a prostitution of the trust so confided to them, and then to interpose the fraud, committed pursuant to their advice as such officers, as a shield to protect them in the possession and enjoyment of that property.
The alienage of the plaintiff, and of James Conway, the plaintiff's ancestor, constituted no bar to the plaintiff's recovery. An alien can hold land conveyed to him as against every one but the state, and, until office found, can maintain actions for its recovery (Bradstreet v. Supervisors of Oneida, 13Wend., 546); and section four of chapter one hundred and fifteen of the laws of 1845 (Laws of 1845, 95) provides that land held by a resident alien at the time of his death shall descend to the persons, although aliens, who, if citizens, would have been the heirs of the deceased, had he been a citizen, and that such alien to whom lands thus descend may hold the same as against every one but the state.
I am of opinion that the judgment appealed from should be affirmed.
COMSTOCK, SELDEN, BROWN, PAIGE and SHANKLAND, Js., concurred in this opinion.
Judgment affirmed